## B. D. WHITNEY *v.* WARREN COWAN.

1. WRITINGS. *Varied by parol proof.*
   The rule which forbids the varying of written instruments by parol proof applies only to the parties to the writing.

2. ASSIGNMENT. *Part of a claim assigned.*
   The assignment of one-half of the amount to be recovered by suit on an unliquidated claim cannot be attacked for invalidity by one who is neither the assignor nor the debtor, although having an interest in the recovery. Whether such an assignment would be declared invalid at the instance of the assignor or debtor, *quære.*

3. INTERPLEADER. *What matters inquired into.*
   In a proceeding by interpleader, it is usually correct to confine the inquiry as to the rights of the claimants to ascertaining which one has the exclusive proprietary interest in, or the right of possession of, the thing in controversy.

4. SAME. *Defendants consenting to interplead. Legal title in one and lien in favor of the other.*
   But where both of the defendants to a bill of interpleader consent to interplead, and a decree for that purpose is entered without objection on their part, the court, having the fund in controversy under its control, may at the final hearing fasten upon it, either in whole or in part, any equitable lien or trust which one of the parties may have established, though the proprietary legal title belongs to the other; and in such case the court is not bound to award the fund wholly to him who has the legal title, but should so shape its decree and distribute the fund as to do complete equity between the parties.

5. SAME. *The scope of inquiry. Case in judgment.*
   J. C. employed C. to collect several claims against the United States, and either J. C. or C. engaged W. to assist in the collection thereof. Afterwards J. C. made a written contract with C. and B. C. for the prosecution of the same claims, and assigned to them fifty per cent of the amount to be collected; and C. agreed with B. & C. to pay W. whatever might be due him. The claims were collected, and fifty per cent of the money was paid to the claimants, twenty-five per cent to B. & C., twelve and one-half per cent to C., and the other twelve and one-half per cent was placed in the hands of K., to await the result of a contest between C. and W., each of whom claimed that he was entitled to receive it. K. filed a bill for interpleader against C. and W. A

decree was rendered, without objection from the defendants, directing them to interplead, and accordingly they preferred their respective claims to the fund. The court awarded the whole fund to C., and refused to consider the claim of W. *Held*, that the action of the court was erroneous, and that it was the duty of the court having the fund and the parties before it to ascertain the amount due W., if anything, and settle the question between the claimants, according to their respective rights.

APPEAL from the Chancery Court of Warren County.

Hon. U. M. YOUNG, Chancellor.

The case is fully stated in the opinion of the court.

*Magruder & Simrall*, for the appellant.

In order that this court may affirm the decree rendered herein, awarding this fund to Warren Cowan, it must be satisfied of two things: first, that the contract and assignment made by J. J. Cowan, administrator, etc., in 1872, with Bartley & Casey and Warren Cowan, was competent to vest in Warren Cowan a proprietary right in a specific portion of the fund to be realized from these claims; and, second, that the fund, when realized, was apportioned or distributed by the claimants or their agents, and a particular part or portion assigned and set over to Warren Cowan, and that the fund now before the court was the identical part or portion so assigned him.

It is needless for us to state that the claims against the government, out of which the fund in controversy was realized, were demands unliquidated and uncertain in amount, and which had never received the assent of the government (the debtor) as to their correctness, and which had to be enforced by suit at law. One-half interest in the amount to be realized from these demands was assigned to Bartley & Casey and Warren Cowan.

It cannot be questioned that unless Warren Cowan was invested with a title to, or proprietary right in, part of the proceeds of the fund realized from the claim assigned him in 1872, he could not follow the money into the hands of a third party. At common law, choses in action were not assignable, but by modern decisions they are assignable so as

to vest in the assignee an equitable interest. But, to constitute such an equitable interest, the assignment must be of the whole debt or thing in which the chose in action consists. The assignment of a part of a chose in action does not vest in the assignee an equitable interest *pro tanto*. It will be observed that we will discuss the question upon the theory that the assignment has been made without the consent of the debtor, as that is the fact in the case at bar. The leading case on this subject, in this country, is the case of *Mandeville* v. *Welch*, 5 Wheat. 277. Judge Story, in delivering the opinion in that case, said : " It is said that a bill of exchange is, in theory, an assignment to the payee of a debt due from the drawee to the drawer. This is undoubtedly true where the bill has been accepted, whether it be drawn on general funds or a specific fund. * * * In cases where an order is drawn for the whole of a particular fund, it amounts to an equitable assignment of that fund, and after notice to the drawee it binds the fund in his hands. But where the order is drawn either on a general or a particular fund, for a part only, it does not amount to an assignment of that part, or give a lien as against the drawee, unless he consent to the appropriation, etc."

To the same effect is the case of *Merrill* v. *Palmer*, 6 Cush. 284. This case being so analogous to the one at bar, and being a contest between the assignee and the administrator of the assignor of a part of a chose in action, we will quote at length from it. The case was this : Spaulding, during his lifetime, effected an insurance on his life for $1,000. Being indebted to one Palmer, he assigned to him, as collateral security, in writing, an interest to the amount of $400 in this policy, and so notified the insurance company. After his death Palmer demanded the amount of his assignment from the company, who refused to pay it, but paid the whole policy to Merrill, the administrator of Spaulding ; whereupon Palmer sued Merrill, administrator, etc., for the amount of his assignment, upon the theory that the fund came into his hands as

assets charged with a lien or trust in his favor, etc.   Chief
Justice Shaw, in delivering the opinion, says : " The question
is whether the case shows an assignment which vested any in-
terest in this policy, legal or equitable, in the plaintiff, Palmer.
We do not question that the assignment may be made of an
entire fund, in the form of an order drawn by the owner on the
holder of the fund or party indebted, with authority to re-
ceive the property or discharge the debt ; but if it be for a
part only of the debt or fund, it is a draft or bill of exchange,
which does not bind the drawee, or transfer any proprietary or
equitable interest in the fund, until accepted by the drawee.
It therefore creates no lien on the fund.   Upon this the au-
thorities seem decisive.   *Mandeville* v. *Welch*, 1 Wheat. 233 ;
*s. c.*, 5 Wheat. 277 ; *Robbins* v. *Bacon*, 3 Greenl. 346 ; *Gibson*
v. *Cooke*, 20 Pick. 15.   If the plaintiff (the assignee) had no
such legal or equitable interest in the debt due on the policy
as would enable him to maintain an action or suit in equity,
either in his own name or in the name of the administrator of
the assignor, for his own benefit, it seems difficult to perceive
on what ground he had any equitable lien on the debt due by
the policy, and if he had not, then the administrator took it
as general assets, charged with no trust for the plaintiff."
See, also, *Kendall* v. *United States*, 7 Wall. 113 ; *Marrion* v.
*Pioche*, 8 Cal. 536 ; *Wheatley* v. *Strabe* et al., 12 Cal. 97 ;
*Farington* v. *Payne*, 15 Johns. 432.

After J. J. Cowan, administrator, etc., in 1872 assigned to
Warren Cowan one-fourth of the money to be realized from
the claims of his intestates against the government, the gov-
ernment never having recognized such assignment, it is certain
that Warren Cowan, the assignee, could not sue the govern-
ment, either in his own name or in the name of his assignor,
to enforce payment of the interest or amount assigned him ;
that he could not prevent the government from compromising,
in any way it saw fit, the claim with the claimant, the assignor.
*Kendall* v. *United States*, 7 Wall. 113.   It is difficult, there-
fore, to perceive on what grounds he had any equitable lien on

the fund after it was reduced to possession.   Hence, when the government paid the claim in 1876, when it was reduced to possession by J. J. Cowan, administrator, etc., the assignor, it came into his hands, according to the principle laid down in *Palmer* v. *Merrill, supra,* as general assets of his intestates, charged with no lien or trust in favor of any one.

It is conceded that, as between the assignor and assignee, the assignment of a part of a liquidated chose in action has been sometimes upheld by a court of equity, where the contest was directly between the assignor and assignee, and where the rights of a third party had not intervened ; but we apprehend that the doctrine that the assignee of a part of an unliquidated chose in action is invested with a kind of inchoate proprietary right in, or lien on, the thing of which the chose in action consists, and which becomes perfected as soon as it is reduced to possession, such as would warrant him to follow the proceeds thereof into the hands of any one, is untenable, and is pushing the doctrine of implied trusts too far.   Such was the position assumed and contended for by counsel below, and such was the theory upon which the master awarded the fund to Warren Cowan.   We have been able to find but one respectable authority that gives countenance to such a doctrine.   It is Judge Story, in his work on Equity Jurisprudence, volume 2, page 406, section 1044.   This doctrine is in direct conflict with the principles announced by the same judge in his opinion in *Mandeville* v. *Welch, supra.*   But the authorities cited to sustain the doctrine of the text do not go to the extent claimed in the text, as is clearly shown by the opinion of Chief Justice Sherwood, of Missouri, in the case of *Burnett* v. *Crandall* et al., reported in 3 Central Law Journal, No. 10, for March 9, 1877, page 230.

We come now to discuss the second requisite to an affirmance of the decree, and that is that Cowan must show that in 1876, when this chose in action was reduced to possession, a part of which had been assigned him in 1872, there was an apportionment or distribution of it made by the claimants,

or their agents (the only ones who could make any valid distribution of it), and a certain portion assigned or set over to him, and that that portion, or a part of it, is the identical fund now in controversy. For the sake of the argument we might concede that the assignment of 1872 did vest in Warren Cowan an equitable interest in, or lien upon, a portion of the fund realized from the claims, a part of which was assigned him; still, before he can recover the fund in controversy, in this kind of a proceeding, he must show an apportionment and setting apart to him of a portion of it as his share, and that the fund now before the court is that identical part or portion; for, even if a certain portion of these claims, when reduced to possession, was impressed with a trust by the assignment of 1872, in his favor, the part before the court having been paid Whitney, or at least being now in the hands of a third party, he must show that the part now in controversy is the identical part upon which he had a lien.

The testimony of Casey and Wilson, together with the receipt given by Klein when the money was placed in his hands, the receipt given by Wilson and Lovell as trustees of Whitney, releasing the claimants from all liability to Whitney for fees, etc., and the discharge from garnishment process of these claimants by Adam & Speed, as attorneys of Cook, establish, beyond the possibility of doubt, that the twelve and one-half per cent placed in the hands of Klein, the very fund now before the court, was placed there by Bartley & Casey, with the consent of Wilson, who was acting for and representing Whitney, with the consent of J. J. Cowan, agent for the claimants; that it was taken out of the general fund and out of moneys belonging to the claimants. It certainly was not taken out of Warren Cowan's part, for at that time none had been assigned him. In fact, Casey, who had possession of the whole fund, refused to pay J. J. Cowan, agent, etc., any part of the fund until Whitney's fees were settled. Klein, in his receipt, says he got the money from Bartley &

Casey, as Whitney's fee, etc., to abide the result of a suit brought by Cook against Whitney; and for no other purpose.

A receipt may be a mere acknowledgment of payment, or may also contain a contract to do something in relation to the thing delivered. In the former case it is merely *prima-facie* evidence of the fact, and not conclusive. In the latter case it is evidence of a contract between the parties, and stands on the footing of all other contracts in writing, and cannot be contradicted or varied by parol. 1 Greenl. on Ev. 354, sec. 305, and cases there cited. So, also, where the payee of a promissory note for $120, not negotiable, delivered it to a third person and took the following receipt: " Received of A a note (describing it), for which I am to collect and account to the said A the sum of $110, or return said note back to said A if I choose;" it was held that parol evidence which was offered to show that the note was held on other and different terms was rightly excluded. *Langdon* v. *Langdon*, 4 Gray, 186. See, also, *Wood* v. *Whiting*, 21 Barb. 190; *Young* v. *Mutual Life Ins. Co.*, 4 Big. 1. So, in the case at bar, J. J. Cowan states that he paid the fund in controversy to Klein, and that Klein received it upon a different understanding, and for an altogether different purpose, from that expressed in the receipt given by Klein; and we respectfully submit that that portion of his testimony was incompetent, and should have been suppressed by the chancellor upon the exceptions taken to its competency.

We submit for the consideration of the court that should we be mistaken in our position as to the effect of the contract of 1872, and should this court be of opinion that it was competent to vest in Warren Cowan a proprietary interest in the fund realized from the claims, then we insist that the contract of 1866, made by Whitney with the claimants, by the terms of which he was to receive twenty-five per cent of the amount recovered, was equally competent to invest him with a proprietary interest in the fund to that extent; and if that be

so, then this interest could not be divested by the claimants by a subsequent inconsistent contract.   No particular form of words is necessary to create an assignment, nor is it necessary that such assignment should be in writing.

*L. W. Magruder*, of counsel for the appellant, argued the case orally.

*Buck & Clark*, for the appellee.

We will state a few legal principles, which, we presume, will not be disputed :   First, when an interpleader has once been decreed, all questions between the complainant and the defendants in the original cause are at an end.   In the new cause between themselves, no one of the defendants can set up as against another any admission or acknowledgment of his right on the part of the original complainant, although it be such as might have been successfully pleaded in bar of the original bill.   The issue is not now one of admission or estoppel, but of ultimate right.   In cases like the present the question is one of title — of proprietary interest — and must be tried accordingly.   Second, " An interpleader can justly be allowed only where no other question than the right of property is meant to be litigated." *Sherman* v. *Partridge*, 4 Duer, 646 ; 2 Dan. Ch. Pr. 1560, note 1.   Third, the nature of the claims must be the same ; one party cannot claim upon a *quantum meruit* against the other, or, admitting the right of the other to the fund, claim that it should be handed over to him in satisfaction of a demand held against his opponent by contract, or otherwise.

The right to be maintained is a right to the specific money or thing — not a demand against the other party for the satisfaction of which it might seem just the money should go.   It is, in the nature of things, impossible to go into inquiries like this in an interpleader cause ; they are not appropriate to the forum, or to the forms of the pleadings and proceedings in such a cause.   It is for this reason, among others, that tenants have been denied the right to compel an interpleader between their landlords and strangers claiming by title paramount ; for

the claim of the landlord is for the rent agreed, while that of the stranger is for an unliquidated sum (*quantum valebant*) for the use and occupation. *Dungey* v. *Angove*, 2 Ves. Jr. 312; 2 Story's Eq. Jur., sec. 812; 2 Dan. Ch. Pr. 1564. The same rule applies where the claim of one party is for the agreed price of goods sold, and that of the other is for damages for the conversion of the same goods. *Slavey* v. *Sidney*, 14 Mee. & W. 801; *James* v. *Prichard*, 7 Mee. & W. 216.

1. In May, 1872, there was, so far as Whitney or Whitney and Lovell were concerned, no legal difficulty in the way of the claimants assigning, to whomsoever they chose, any portion of the moneys to be recovered on these claims. They did, by formal writing, assign and set over, May, 1872, to Warren Cowan and Bartley & Casey, one-half of the amounts which should be recovered pursuant to the contract then made, and to the power and appointment then conferred upon them. It is contended by appellant's counsel that this assignment passed no interest, either legal or equitable, *in presenti* or *in futuro;* that it was absolutely void, not only as against the government, but as between the parties. The doctrine which counsel discuss so earnestly appears to us to touch the present controversy only remotely, since any infirmity in the assignment, arising out of this principle they contend for, was effectually cured by the action of the assignors in recognizing the interest and title of the assignees, when the claim ceased to be a thing in action and came into existence as a thing in possession.

But we would be entirely willing to rest the case upon a test of the correctness of counsel's view, for we think it apparent that they wholly misapprehend the scope of the principle they invoke. Mr. Justice Miller states the doctrine, with its proper limitation, when he says that an unliquidated claim " cannot be so assigned as to prevent the original parties from compromising or adjusting it on any terms that may suit them." *Kendall* v. *United States*, 7 Wall. 113.

It is over the question whether an order for part of the

sum due shall be regarded as an assignment *pro tanto*, that
the courts have mainly differed — the older decisions holding
that it will not be, and some of the more recent that it will
be, at least in equity.  But where there has been (as here) an
actual assignment by apt and sufficient words of transfer,
courts of equity have never failed to uphold and effectuate the
transaction — always respecting the rights of the debtor, in
case of unliquidated demands, as to compromise and settle-
ment with the original claimant.

The whole law respecting rights or choses in action has
been gradually undergoing a change calculated to promote
their better enjoyment.  The old idea that it was against
public policy to allow them to be assigned has long since been
exploded, the reason upon which it was founded having
ceased to exist.  "Nothing," says Coke, "in action, entry,
and reëntry can be granted over, for under color thereof
pretended titles might be granted to great men whereby right
might be trodden down and the weak oppressed."  Co. Lit.
14 *a*.

It has been well remarked that feeble, partial, and corrupt
must have been the administration of justice when such a rea-
son could have force.  *Thallhimer* v. *Brenkerhoff*, 3 Cow. 543.
And so the objection that part assignments may subject the
debtor to the harassment and costs of several actions has been
regarded in equity as more fanciful than real, and as being a
technical and unreasonable restriction upon the enjoyment of
such rights — especially since, in a court of equity, all the
parties in interest may be joined in one suit.  *Field* v. *Mayor*,
etc., 6 N. Y. 179.

We think, therefore, notwithstanding the doubt suggested
in the Missouri case, that Judge Story states the equity doc-
trine correctly in his work.  2 Story's Eq., secs. 1041–1044.
Whether this be so or not as respects the question of the rights
of the debtor, it is certainly true that he is sustained by the
authorities in so far as the question between assignor and as-
signee is concerned.  His own expressions in *Mandeville* v.

*Welch*, he subsequently tells us, are to be understood as applicable to the doctrine at law, only.  *Tiernan* v. *Jackson*, 5 Pet. 598.  And see *Shankland* v. *Washington*, 5 Pet. 394. Of the cases cited in support of the text, the only two we have had access to support it substantially :  *Lett* v. *Morris*, 4 Sim. & St. 607 ;  *Yeates* v. *Groves*, 1 Ves. Jr. 280.  And it is fully supported by others since decided :  *Morton* v. *Naylor*, 1 Hill, 584 ;  *Field* v. *Mayor*, 6 N. Y. 179 ;  *Cook* v. *Insurance Co.*, 8 How. Pr. 514.

A distinction is sometimes made between an assignment of an interest in the demand and an interest in the money to accrue from it, and wherever the facts admit of such a distinction the courts will lay hold of it in favor of the assignee. *Cromwell* v. *Insurance Co.*, 39 Barb. 227 ;  *Tiernan* v. *Jackson*, 5 Pet. 594, 595.  In the present case the assignment was not of one-half of the claim *in presenti*, but of " fifty *per centum* of the gross amount that may finally be recovered, received, or secured," thereon.  This neither militated against the rights of the debtor nor contravened any principle of law of which we are aware.  Not even the objection as to costs could be urged, since there could be no action by the assignee ; nor could this objection ever have had force in cases like the present, in which the government takes care that the costs of determining the rights of the claimants shall be taxed against the fund.  But as soon as the money came into existence, the assignment attached and the interest of the assignees became complete and vested. *Pennock* v. *Coe*, 23 How. 128 ;  *Sellers* v. *Lester*, 48 Miss. 513.

In view of the authorities, we think it cannot be gainsaid that, when J. J. Cowan received the proceeds of these claims from the government, the title of Warren Cowan and Bartley & Casey to their half became complete and vested in equity. He received one half to his own use, and the other half to their use and in trust for them.  He so understood it and so dealt with the fund.

Can there be any doubt that there was now such a severance

and separation of the interests of the parties as vested in War-
ren Cowan a complete title in severalty in this twelve and one-
half per cent? The real nature of the transaction admits of
but little controversy. Where does this "twelve and one-half
per cent" first make its appearance in this case? Do we find it
in any obligation of the claimants, or of Warren Cowan? No;
it first appears in a contract made between Bartley & Casey
and Whitney and Lovell in September, 1875 — a contract
made in compromise of a previous litigation between them. It
is.impossible that that contract should import any obligation
against Warren Cowan, and yet, when this money comes to be
collected, it is insisted by Bartley & Casey that this obligation
of theirs shall be satisfied by him. True, Warren Cowan has
promised them to pay whatever was due Whitney, out of his
share, but that meant whatever was justly due him under his
original employment, and not under any promises of Bartley
& Casey; whatever was due him on May 18, 1872, under con-
tract theretofore existing with him or the claimants — not what
might be due him on May 27, 1876, under a contract with
Bartley & Casey, made September 8, 1875.

It will be observed that Whitney did not assert any claim to
this money under his original employment; he testifies that in
making the agreement with Bartley & Casey he abandoned all
claim under his original contract. It is manifest that he rested
entirely upon his contract with them, and this was "distinctly
declared" by his attorney in the interview on May 25th or
26th, in Washington. So that the matter stands simply thus:
Whitney and Lovell had their contract with Bartley & Casey,
and must look to them for the twelve and one-half per cent
which they have agreed to pay, while Bartley & Casey have
the collateral obligation of Warren Cowan, under which he is
answerable to them, not for this twelve and one-half per cent,
but for whatever was justly due Whitney under his original
employment at the time that obligation was given.

This obligation of Cowan's can have no other effect than this;
it cannot be the source of any rights in Whitney or Lovell; it

was not contracted with them, but with Bartley & Casey, and between the latter and Cowan must be litigated whatever rights may arise out of it.

2. Counsel have laid great stress upon the receipts given in Washington. They have misapprehended their legal effect. If those receipts had embodied the whole transaction — if there had been no mention of Cowan and no understanding that the ·money should be held subject to his right, as well as that of Whitney and Lovell — then there is a technical rule (of which Judge Story doubts the wisdom, sections 819, 820) which would have prevented Klein from obtaining a decree of interpleader if the agreement had been pleaded in bar to his bill. But the result would have simply been that Cowan could have prosecuted his action, and, having recovered the fund as his, Klein could then have defended against the obligation to Whitney by showing that the money had been taken out of his possession by superior title.

But it cannot be justly argued that Klein in giving the receipt for the money, or Cowan in receiving the release from the garnishments, intended to acknowledge any absolute right in Whitney, or Whitney and Lovell, to the money ; and what · was their true intention, it is competent for Warren Cowan, who was not a party to the writings, to establish, as we shall presently show, however it may contravene the legal effect of the writings themselves. These papers are to be read in view of the surrounding circumstances, not losing sight of the fact that Klein and Cowan were not lawyers, and that they had not that personal interest in the matter calculated to make them circumspect in their action.

They were never intended to express the full understanding which the parties to the controversy had arrived at, else they would have been drawn up at the time, and signed by all the parties ; or, what is more probable, the whole agreement would have been expressed in one paper, and signed by all. But they were not executed until the day following the agreement, were unilateral in form, and were aimed at a single ob-

ject, namely, the substitution of the money for the personal
liability of the garnishees, subject to the like contingency that
existed with reference to them (the contingency of Whitney's
right), and a provision for its proper disposition in case that
contingency should be determined in his favor.   They were
writings executed in part expression and performance of the
oral agreement previously entered into, and not for the pur-
pose of putting the whole of that agreement in writing.   To
such writings as these the familiar rule against the admission
of parol testimony, which is invoked by counsel in this con-
nection, does not apply even as between the parties to them.
2 Whart. on Ev., secs. 1015, 1016, citing many authorities;
*Ib.*, sec. 1064; 1 Greenl. on Ev., secs. 284 *a*, 288 *a*, and
304.

But if it be admitted that the rule excluding parol evidence
applies, or would apply, as between the parties to these in-
struments, still it is clear beyond question that it does not
apply as against Cowan — a proposition which counsel have
omitted to notice in their brief, although submitted by us in
argument below.   Being a stranger to the instruments, he is
permitted, if they are brought to bear against his rights or
interests, to explain them by parol, and to show that they do
not express the whole of the agreement between the parties.
1 Greenl. on Ev., sec. 279; 2 Whart. on Ev., sec. 923, and
note 2.

The whole case may be stated in a very small compass:
Whitney and Lovell have a right of action against Bartley &
Casey under their agreement of September 8, 1875, for one-
half the amount received by the latter as fees in these three
cases.   When Bartley & Casey have satisfied it, they will
have a right of action against Cowan on his agreement of
May 18, 1872, not for what they may pay, but for "whatever
was due" Whitney at that date for his services theretofore.
But the proprietary right to the money is in Cowan; he is the
owner of this particular fund.

Whitney and Lovell have made a mistake in pursuing Cowan.

instead of Bartley & Casey. It is to the latter only that they are to look for twelve and one-half per cent of the recovery in these cases; and if they have ever had a specific interest or property in any part of the proceeds, it is in the twenty-five per cent paid over to them.

*E. D. Clark*, of counsel for the appellee, argued the case orally.`

CHALMERS, J., delivered the opinion of the court.

John A. Klein, a banker of the city of Vicksburg, filed his bill in the Chancery Court of Warren County, setting forth that he held as a stake-holder, without personal interest, the sum of $4,018.65, which was claimed both by Warren Cowan and by Benjamin D. Whitney, with the latter of whom was connected one O. Lovell; that Cowan had already brought a suit at law against him for the recovery of the money, and that Whitney was threatening to do so. He therefore prayed that these parties might be compelled to interplead and settle their respective rights. Cowan and Whitney each answered, admitting the allegations of the bill and averring their willingness to propound and litigate their respective claims. Thereupon a decree was entered by which Klein, the complainant, was dismissed with his costs, and Cowan and Whitney were directed to litigate *inter sese* their respective rights to the fund. The litigation resulted in a decree in favor of Cowan, from which Whitney appeals.

The facts which determine the rights of the parties are controverted, and somewhat complicated. So far as they are essential, we state that view of them which we think is established by the weight of the testimony. In 1866, George Hawkins, Sarah Cowan, and James Cowan, administrator of John Cowan, deceased, citizens of Warren County, placed in the hands of Warren Cowan, an attorney of Vicksburg, a claim against the United States government for 228 bales of cotton which had been seized and sold by Federal officials during the Civil War, and the proceeds of which were in the treasury, to

abide the claims of the owners.  During the summer of 1866, B. D. Whitney, of Washington City, a claim agent, but not a lawyer, visited Vicksburg in search of claims to be prosecuted against the government.  Either by Warren Cowan or by the claimants, Whitney was employed to assist in the collection of the Cowan and Hawkins claims, at a rate of compensation as to which the parties differ, and which it is not necessary for us now to decide.  From some cause the prosecution of the claims was so dilatory that it was not until August 13, 1868, at which time they lacked only seven days of being barred, that petitions for their enforcement were filed in the Court of Claims by the Hon. Caleb Cushing, who had been employed by Whitney for that purpose.

Nothing more seems to have been done in the matter until 1871, when Mr. Cushing, being about to depart as minister to Madrid, transferred his business in the Court of Claims, including these cases, to Bartley & Casey, attorneys, of Washington, receiving from these gentlemen a sum of money in gross for the fees due him, and they obligating themselves to compensate Whitney.  Bartley & Casey then made a written agreement by which they contracted to pay Whitney a certain per cent upon the fees realized in all cases controlled by him, which were quite numerous.

In May, 1872, Bartley came to Vicksburg, and he and Warren Cowan together took the testimony upon which the cases were ultimately gained.  Sarah Cowan having died, and James Cowan having become likewise her administrator, he entered into a written contract by which he assigned and transferred to Warren Cowan and to Bartley & Casey twenty-five per cent each of the claims, or of the recovery to be had on them, in compensation of their services.

Warren Cowan, by an *addendum* to this contract, stipulated with Bartley & Casey that he would pay to Whitney whatever amount might be due him.  Cowan, however, had no knowledge of the contract entered into between Whitney and Bartley & Casey, and his *addendum*, therefore, must be construed

as referring to any amount that might be due Whitney under his original contract of 1866. After Bartley's return to Washington a difficulty arose between his firm and Whitney in relation to the interest of the latter in the fees arising under the business turned over from Cushing, and on September 8, 1875, a new contract was entered into, by which Whitney's interest was fixed at twelve and one-half per cent on the recovery in each case. Neither the claimants nor Warren Cowan had any knowledge of this agreement.

In May, 1876, judgments were rendered in the Court of Claims in favor of Hawkins and James Cowan, administrator, aggregating more than $30,000.

James Cowan proceeded at once to Washington to receive payment both for himself and Hawkins, from whom he held a power of attorney. The warrant upon the treasury having been issued jointly to himself and his attorneys of record, Bartley & Casey, a difference arose between them as to the fees due Whitney. The attorneys, who, by their agreement with Whitney, had become liable to him for twelve and a-half per cent of the total recovery, insisted that this amount should be deducted from the twenty-five per cent due to Warren Cowan, and should be paid over to themselves, or to one Wilson, the agent of Whitney.

James Cowan declined to accede to this proposal, both because he insisted that if anything was due Whitney it should be settled between Whitney and Warren Cowan, and because he, James Cowan, had been garnished as the debtor of Whitney, in an attachment suit then pending in the Circuit Court of Warren County, brought by one Reese Cook against Whitney.

After an altercation extending through several days, it was at length agreed that eighty-seven and a-half per cent of the fund should be divided according to the several rights of the parties, and that twelve and a-half per cent should be placed in the hands of Klein, who happened to be in Washington, and should be retained by him as a stake-holder. The twelve and

a-half per cent, amounting to $4,018.65, constitutes the fund in controversy. It was delivered to Klein, along with about $6,000 of other moneys belonging to Whitney, all of it to await the event of the attachment suit of *Cook* v. *Whitney*, and the $4,018.65 to await (as we think is established by the testimony) both the event of the attachment suit and a contest between Warren Cowan and Whitney as to their respective claims upon it. Klein gave a receipt for the whole amount of money received by him, specifying that it was to be held to abide the event of the attachment suit of *Cook* v. *Whitney*, but making no mention that the $4,018.65 was also to be held subject to a contest between Warren Cowan and Whitney.

It is earnestly insisted that Warren Cowan cannot, by parol proof, vary the terms of this receipt, because it is in its nature both a receipt and a contract, and, in so far as it is a contract, is governed by the ordinary rules in relation to written instruments. Conceding the full force of the principle, how does it affect Warren Cowan? He was no party to the receipt, nor to the contract embodied in it. The money was in the hands of his client. It was deposited by the client with Klein, through an arrangement with Bartley & Casey, and with Wilson, the trustee of Whitney. Warren Cowan neither knew of nor assented to this arrangement, and never saw the written papers that accompanied the deposit. If those papers omitted a stipulation which should have been embraced, and by which his rights would have been protected, we know of no principle which precludes him from showing it. The rule which forbids the varying of written instruments by parol proof applies only to the parties to the writing. 1 Greenl. on Ev., sec. 279; 2 Whart. on Ev., sec. 923, and notes.

It is further insisted, with much earnestness by counsel for Whitney, that the assignment of one-half of the recovery to be realized on the claims, which was executed by James Cowan, administrator, to Warren Cowan and Bartley & Casey, in May, 1873, was invalid upon the ground that neither at law nor in equity can a portion of a claim for an uncertain and un-

liquidated amount be assigned so as to transfer to the assignee a valid title to the portion attempted to be transferred. There are, undoubtedly, respectable authorities which assert this doctrine, where the attempt of the assignee to enforce the assignment is resisted either by the assignor or by the debtor; but it is impossible to see what connection this doctrine has with the present controversy. Here the debtor (the United States government) has paid over the fund; the assignor, J. J. Cowan, acknowledging the validity of the transfer which he had made of half of it, has paid to Bartley & Casey the twenty-five per cent belonging to them; has paid to Warren Cowan one half of the twenty-five per cent belonging to him, and has placed the other half in the hands of Klein, in order that Warren Cowan and Whitney may settle their respective claims upon it. How, under such circumstances, Whitney can question the validity of the transfer of one-half the claim made by the owner, in May, 1872, to Warren Cowan and Bartley & Casey, even if we admit that such a transfer could not have been enforced in a court of equity in a suit between the parties, we are unable to perceive.

The court below awarded the whole fund to Warren Cowan, declining to consider whether Whitney was entitled to any portion of it under his original employment in 1866. This action, as we gather from the report of the special commissioner in the lower court, and from the argument of counsel here, was based upon the idea that, in order to the successful assertion of a claim in a proceeding by interpleader, there must be shown a right of ownership, an exclusive proprietary interest in the whole thing in controversy, and that nothing could be litigated in such a suit save the title or the right to the possession of the subject-matter of dispute. Inasmuch, therefore, as Whitney did not claim that under his original employment any portion of the amount to be recovered had been transferred to him, but only that he was entitled to a certain per cent upon the sum to be realized, it was held that he could have no standing in this litigation.

We cannot assent to this view. Undoubtedly, there are many limitations upon the proceeding by interpleader. It can never be maintained where the party filing the bill himself desires to assert any interest in, or claim upon, the thing in controversy, and his bill must always contain a disclaimer of personal interest, and be accompanied by an affidavit of absolute neutrality. A tenant cannot compel his landlord to interplead with a stranger ; nor can a bailee compel his bailor to interplead with another, touching his right to the property held in bail. It is also true that interpleader will not lie if the complainant has come under some personal obligation to either of the defendants, independent of the title or the right to possession, because such defendant would, in that event, have a claim against him, disconnected with the title, which could not possibly be settled in a litigation with the other defendant. But these and other objections apply rather as against the complainant than between the defendants. If urged and established by either of the defendants, they will produce a dismissal of the bill ; but they lose much of their force where the defendants, without objection, consent to interplead, and permit a decree discharging the complainant.

It is manifest that they should not be applied in this case. Warren Cowan's claim, as asserted by James Cowan at the time of the deposit with Klein, was that the fund should be paid over to himself, in order that he might pay to Whitney whatever amount was due him under the original contract of 1866. Whitney's claim, as asserted by his trustee, Wilson, was that the whole fund belonged to him, and that he should receive it. It was deposited with Klein to abide the settlement of these conflicting claims. He became the stake-holder for both. When he filed his bill calling upon them to interplead, neither made the slightest objection, but both virtually consented, by their answers, that a decree dismissing Klein with his costs, and directing them to propound their claims, should be entered. No appeal has been taken from this decree. Whitney, in preferring his claim, based it both

upon his original employment in 1866, and also upon the contract entered into with Bartley & Casey in 1875. Because the latter claim is unfounded, it would be most inequitable to refuse to investigate the former, and thus permit Warren Cowan to appropriate the whole fund in practical violation of the contract under which the deposit was made.

He admits, in all his pleadings and testimony, his liability to pay Whitney the amount due him under the contract of 1866, and his struggle has been to show that Klein received the money subject to a contest between himself and Whitney as to what that amount was. The Chancery Court, having the fund and the parties before it, should have settled this question, and not have paid over the whole fund to one and left the other to a suit at law.

We therefore reverse the decree of the court below, and remand the cause for further proceedings; the sole question to be determined being as to the amount due Whitney, if anything, under his original employment in 1866, and in consideration of the services rendered thereunder, regard being had to the manner in which he discharged his duty.

Let the decree be entered accordingly.

A REARGUMENT of the case was granted, upon the application of the appellants. Elaborate briefs were again filed.

*Magruder & Simrall*, for the appellant.

*Buck & Clark*, for the appellee.

CHALMERS, J., delivered the opinion of the court.

In the former opinion delivered in this case we declared that the legal objections to the entertaining of a bill of interpleader were, generally speaking, available only against the complainant, who sought to compel the parties defendant to propound before the court their respective claims to the fund or property in his hands; and that if those parties consented that the fund might be brought into court, and that the complainants might be discharged with his costs, and they then

proceeded to litigate with each other their respective demands, the stringent rules regulating the proceeding by interpleader lost much of their force, and the court might, unshackled by technicalities, make such final decree between the parties as the principles of equity jurisprudence might sanction or suggest.

That the correctness of this announcement might be thoroughly investigated, we granted the reargument. That reargument has been marked by great research and much ingenuity; but neither the investigations of counsel nor our own have conducted us to any authority decisive of the question.

We have seen no case, indeed, where the point arose. In all of those which have fallen under our observation, the objection to entertaining the bill has been urged against the complainant, who invoked the interpleading, by one of the parties who was called upon to interplead.

While, therefore, we adhere to our former adjudication, and think that it is both salutary and consistent with sound reason, it must stand upon its own merits, alike unsupported and unassailed by authority, so far as we can discover. We must not be understood as saying that there is any lack of authority in support of the proposition that interpleader will lie, though one party claims the fund or property by a legal, and the other by an equitable, title, because this is well settled and is conceded by counsel. *Langston* v. *Horton*, 3 Beav. 464; *Lorzier, Exr.,* v. *Ackerman*, 2 N. J. Ch. 325; *Yates* v. *Tisdale*, 3 Edw. Ch. 71; *Duncey* v. *Angove*, 2 Ves. Jr. 312; *Slavey* v. *Sidney*, 14 Mee. & W. 801.

Our proposition goes a step beyond this, and is to the effect that, where both the defendants consent to interplead, and a decree is entered without objection for that purpose, the court may, at the final hearing, having the fund in its hands or under its control, fasten upon it, either in whole or in part, any equitable lien or trust which one of the parties may have established, though the proprietary legal title and ownership be-

longs to the other ; that, in such case, the court is not bound to award it wholly to him who has the legal title, but may so shape its decree and distribute the fund as to do complete equity between the parties. This necessarily results, we think, from the doctrine that a court of equity, having, without objection from either party, taken jurisdiction, will not release it until complete equity has been done.

But counsel say that, conceding this to be the law, it can have no application here, because Whitney, under his contract with the claimants in 1866, not being a lawyer, obtained no lien, legal or equitable, on the fruits of the litigation with the government, but holds a mere money demand against them, a personal debt, which can give him no legal right to subject this fund to its payment, nor a *locus standi* in a court of equity to fasten a trust upon it.

This may be true as regards the original claimants, but he occupies a very different attitude towards Warren Cowan. He and Warren Cowan, under the contract of 1866, were *quasi*-partners. They were to share together, in some uncertain proportion, the fee agreed to be paid by the owners for the recovery of the claim. As against Warren Cowan, therefore, a court of equity will fasten upon this fund, now in its hands, which represents that fee, a lien in Whitney's favor. Again, neither this fund nor any part of the $30,000 recovered from the government could, under the regulations of the department, have been gotten out of the treasury or brought to Mississippi without the consent of Bartley & Casey, the attorneys of record. From the anxiety manifested by them to protect Whitney's interest, it cannot be supposed for a moment that they would have consented to the delivery of the money to Klein if they had supposed that Whitney was to be debarred of the assertion of any claim, legal or equitable, which he might have upon it. While Warren Cowan was no party to that agreement, and J. J. Cowan, his agent, acted without authority, it was very greatly to his advantage that the money should be drawn from the treasury, in the first

place, and should be brought to Mississippi in the second. He cannot obtain the advantages of the arrangement and repudiate its burdens, nor refuse to be bound by it, in the sense in which it was undoubtedly understood by Bartley & Casey, and by Wilson, the trustee of Whitney.

The decree entered at the former argument will remain undisturbed.