[Civ. Nos. 3480, 3481 and 3482. Third Appellate District.—May 29, 1929.]

EAST BAY MUNICIPAL UTILITY DISTRICT, Respondent, v. STEPHEN E. KIEFFER, Appellant.

242

James F. Peck, F. J. Solinsky, T. A. Farrell, Wm. G. Snyder and Charles F. Rafferty for Appellant.

T. P. Wittschen, T. G. Negrich, Ralph McGee, C. Irving and Harold Raines for Respondent.

FINCH, P. J.—The defendant Kieffer, who will be referred to as the defendant, has appealed from the judgments in three separate proceedings in eminent domain. The three cases were consolidated for trial and tried together.

The plaintiff district includes within its boundaries the principal cities on the easterly shore of San Francisco Bay. For the purpose of providing a water supply for these cities the plaintiff selected a reservoir site, referred to by the parties as the Lancha Plana site, on the Mokelumne River, with the object of impounding the waters of that stream. Northerly and over a ridge from the Lancha Plana site is another reservoir site, referred to as the Arroyo Seco site. The plaintiff was granted a license by the federal power commission to construct and operate its proposed dam and reservoir and it acquired some of the lands in the reservoir site. Prior to the commencement of these suits the defendant had acquired title to large areas of land in both the Lancha Plana and the Arroyo Seco sites and options to purchase other lands in both sites. He had also acquired title to all but a small parcel of a strip of land connecting the larger areas owned by him in the two reservoir sites, this small parcel being in the middle of the strip and the title thereto being in Lee De Vries. At the time the first two suits were commenced the defendant held a mere option to purchase this De Vries parcel. He thereafter allowed the option to expire but it was subsequently renewed and

he acquired title from De Vries before the third suit was filed.

September 7, 1926, the complaint in the first suit was filed and summons issued. The lands sought to be condemned by that suit consist of 5,657.1 acres owned by the defendant and lying on the Mokelumne side of the ridge. On the same day, in like manner, the plaintiff commenced the second suit to condemn 360 acres of land immediately along the Mokelumne River, owned by the Pacific Gas and Electric Company, on which the defendant held an option to purchase, and to which he acquired title before the trial. After the commencement of the first two suits the defendant acquired title to 1248 acres of other lands on the Mokelumne side of the ridge, on which he held options when the first two suits were commenced, and on December 20, 1926, the plaintiff commenced the third proceeding, by which it sought to condemn those lands. Prior to that time, as stated, the defendant had acquired title to the De Vries parcel of land, thereby consolidating all his holdings, except a small isolated parcel. The lands taken by the third suit, however, were entirely separated by those condemned in the first two proceedings from the other lands belonging to the defendant. The lands condemned in the three suits were not wholly within the reservoir site but, with two exceptions, included all of the defendant's contiguous lands, severance damages being thereby reduced to a minimum.

The defendant in his answers claimed damages by reason of the severance of lands under option from lands owned by him which were taken. On motion of the plaintiff, the court struck out the allegations of the answers relating to such damages.

It may be conceded that an option to purchase land is property, but it does not constitute an interest in the land itself. "An option is not a transfer of property. No title is conveyed thereby. It is a mere right of election . . . to accept or reject a present offer within the time therein fixed." (*Ware* v. *Quigley*, 176 Cal. 694, 698 [169 Pac. 377, 378]; *Ludy* v. *Zumwalt*, 85 Cal. App. 119, 130 [259 Pac. 52].) The holder of a mere option to purchase land being condemned is not entitled to any part of the compensation to be paid therefor. (*Russakov* v. *McCarthy Co.*, 206 Cal. 682 [275 Pac. 808]; *In re Water Front on Upper New*

*York Bay,* 246 N. Y. 1 [157 N. E. 911].) The lands under option referred to in the allegations stricken out were not sought to be condemned by the plaintiff. If it be contended that the defendant's ownership of the options enhanced the value to him of the lands taken, the obvious answer is that the value thereof to him or to any person in his situation is immaterial, he being entitled only to the market value of such lands and not to any special value thereof to him by reason of his advantageous position. (10 Cal. Jur. 339; *Oakland* v. *Pacific Coast Lumber & Mill Co.,* 171 Cal. 392, 399 [153 Pac. 705].) Since the appellant had no interest in the lands under option, it is axiomatic that he was not entitled to damages by reason of their severance from his lands which were taken, if such taking may be termed a severance. Of course, if the lands under option had been held under a contract obligating the defendant to purchase them a different rule would apply.

▪ Over the defendant's objection the trial court, without the presence of the jury, heard and determined the issue of whether or not the several tracts of land owned by the defendant constituted a single parcel within the meaning of section 1248, subdivision 2, of the Code of Civil Procedure, relating to severance damages. Appellant contends that this issue should have been determined by the jury. It is unnecessary to decide what the general rule is, because in this case there is no conflict in the evidence bearing upon that issue and it was, therefore, "essentially a question of law for the determination of the court." (*Oakland* v. *Pacific Coast Lumber & Mill Co., supra.*) ▪ The court found that the defendant's lands on the Arroyo Seco side of the ridge constituted a separate parcel from those which were taken. It follows from what has already been said that this finding is the only one that could be made from the evidence in so far as the first two proceedings are concerned. "For the purpose of assessing compensation and damages the right thereof shall be deemed to have accrued at the date of the issuance of summons and its actual value at that date shall be the measure of compensation for all property to be actually taken, and the basis of damages to the property not actually taken but injuriously affected, in all cases where such damages are allowed as provided in section 1248," if the case is tried within a year after the

commencement of the proceeding. (Code Civ. Proc., sec. 1249.) These proceedings were tried within a year after the first two were commenced. At the time they were ·commenced the De Vries parcel, on which the defendant held a mere option,. divided his holdings into two separate parcels. Damages by reason of severance are limited to land which is contiguous to that taken. (*Oakland* v. *Pacific Coast Lumber & Mill Co., supra; City of Stockton* v. *Ellingwood,* 96 Cal. App. 708 [275 Pac. 228].) In the Oakland case there was an existing unity of use between the parcels of land in question but no physical contiguity. In this case the unity of use asserted by the appellant is prospective and problematical only.

Prior to the time the third proceeding was commenced the defendant had acquired title to the De Vries parcel, thereby establishing physical contiguity between the two larger parcels. He contends that therefore he ''has the right to have the question of severance damages, with reference to the last suit filed, determined just as though the first two suits had not been filed, except in so far as he would receive double allowance'' by considering the facts of each case without reference to those of the others. However plausible this argument may seem at first blush, it will not bear analysis. At the time the first two suits were commenced the defendant had not acquired title to the lands sought to be condemned by the third, and the latter lands were entirely separated by the lands involved in the first two suits from all other lands owned by the defendant. Had the first two suits been tried and title thereby acquired before the third one was commenced there would be no basis for appellant's contention that the lands taken· by the third suit are a part of the same parcel as the Arroyo Seco lands. The fact that the third suit was commenced before the others were tried rather than thereafter can make no difference. The defendant had answered the complaints in the first two suits and, therefore, must have had knowledge thereof, prior to the time he acquired title to the lands condemned by the third. The title finally acquired by the plaintiff in the first two suits, as against intervening rights of persons having actual or constructive notice of such suits, relates back to the commencement thereof: (*Smith* v. *Jeffcoat,* 196 Ala. 96 [71 South. 717]; *School*

*District of Ogden* v. *Smith,* 113 Ark. 530 [168 S. W. 1089];
*Currie* v. *Bangor & A. R. Co.,* 105 Me. 529 [75 Atl. 51];
*Dowie* v. *Chicago, W. & N. S. Ry. Co.,* 214 Ill. 49 [73 N. E.
354]; 16 Cal. Jur. 652.) The defendant's right to damages
by reason of severance in the third suit is the same as if,
at the time the first two proceedings were commenced, he
had conveyed to the plaintiff the lands condemned in those
suits.

After the trial court had determined that the de-
fendant's lands in the two reservoir 'sites did not constitute
a single parcel, a jury was impaneled to determine the
compensation to which the defendant is entitled. At the
trial before the jury the defendant again sought to intro-
duce evidence to show that all his lands constituted a single
parcel. After sustaining numerous objections to the intro-
duction of such evidence, the court said: "I can see the
purpose of it, and it is absolutely intended to hereafter
mislead somebody." In the final instructions to the jury,
the court said: "Remarks and arguments of counsel . . .
and any remarks made by the court during such arguments
. . . should be disregarded by you in arriving at your
verdict." Without attempting to justify the remarks in
question, the error of making them is not deemed sufficiently
serious, in view of the instruction quoted, to require a
reversal.

While the court refused to permit proof that the market
value of the defendant's lands in the Arroyo Seco basin
would be depreciated by the taking of the lands condemned,
the defendant was permitted to introduce evidence tending
to show that the availability of the Arroyo Seco basin as a
reservoir site enhanced the market value of the lands taken,
the evidence showing that when the Lancha Plana reservoir
is full the surplus waters of the Mokelumne River can be
readily diverted through the reservoir and across the ridge
mentioned into the Arroyo Seco basin. In an effort to over-
come the effect of such evidence, the plaintiff introduced its
federal license, by the terms of which the plaintiff is re-
quired, at its own cost and expense, to construct and main-
tain a spillway for the purpose of diverting such surplus
waters to any authorized user thereof in the Arroyo Seco
basin.

The defendant was permitted to show the volume of water flowing in the Mokelumne River, the capacity of the Lancha Plana reservoir and the capacity of a reservoir which could be constructed in the Arroyo Seco basin, the amount of electric power which could be developed, the irrigable lands in need of water, the cities and towns, including those in the plaintiff district, which could be supplied with water and power from such a combined reservoir system and the amount now consumed by them, the available use of the system as a means of flood control and of protecting the delta lands of the Sacramento and San Joaquin Rivers against salt water. The defendant was not permitted to show the present selling prices of water and power, the increase in the market value of the irrigable lands mentioned which would result from a "dependable water supply," the increase in value of delta lands which would be caused by holding back the salt water, and other evidence tending to show the returns to be received from the sale of water and electric power. The defendant sought to make such proof by his own witnesses and by cross-examining plaintiff's witnesses. In a proceeding to condemn a completed water and power system, in full operation, evidence of the character in question would have a direct bearing upon the value of the system. The supreme court of this state has never said "that the value in use, as contradistinguished from the estimated value of a proposed problematical use, might not be given in terms of money, not as determinative of the question, but as evidence of the ultimate fact which the jury is called upon to find, namely, the market value." (*Oakland* v. *Pacific Coast Lumber & Mill Co., supra.*) But the relation between the value of land in a proposed reservoir and the current price of water and electric energy is too remote and conjectural to be of any reliable assistance to the jury in determining the market value of the land taken. Although the evidence rejected consisted of proof of past and present facts, the inference sought to be drawn therefrom is highly speculative. Speculative and conjectural calculations of prospective receipts and expenditures and consequent profits to be derived from a prospective enterprise not only throw no light on the issue of the market value of the land to be used in the enterprise, but operate to confuse and mislead the minds of the

jurors. (*San Diego Land & Town Co.* v. *Neale,* 88 Cal. 50, 61 [11 L. R. A. 604, 25 Pac. 977].) "It is said in some cases that it is proper to consider every element of value which would be taken into consideration in a sale between private parties. But this needs some qualification, since remote and speculative reasons are often urged by the seller in support of the valuation claimed." (Lewis on Eminent Domain, 3d ed., sec. 706.) In section 709 of the same work, by way of illustration, it is said: "It may be shown that land is suitable for raising cranberries, but it is not competent to go into the price of cranberries, the quantity which might be raised, and the like." It is well settled in this state that evidence of the character in question is inadmissible. (*City of Los Angeles* v. *Hughes,* 202 Cal. 731, 734 [262 Pac. 737]; *City of Stockton* v. *Vote,* 76 Cal. App. 369, 400 [244 Pac. 609]; *San Joaquin etc. Canal & Irr. Co.* v. *Stevinson,* 63 Cal. App. 767, 769 [220 Pac. 427].) The admission of evidence which leads to conjectural speculations is equally harmful, whether on cross-examination or direct.

■ Appellant contends that the court erred in requiring his witnesses, on cross-examination, "to state the market value of the land with the reservoir use eliminated." Such testimony was, in effect, a statement of the value of the land for particular purposes. Great latitude is allowed in the cross-examination of witnesses who have testified to the market value of land. (10 Cal. Jur. 1028.) In *City of Stockton* v. *Ellingwood, supra,* the following language is quoted from *Tracy* v. *City of Mount Pleasant,* 165 Iowa, 435 [146 N. W. 78]: "Undoubtedly inquiry would be proper on cross-examination as to what purpose a witness thought the property available for and his notion of its market value for such purpose."

■ For the purpose of testing the knowledge of such witnesses and impeaching their opinions as to values the court permitted the plaintiff to ask them, on cross-examination, to state their knowledge of other sales of land in the vicinity and of prices recently paid by the defendant for the lands taken. This was not error. (10 Cal. Jur. 364.) The court instructed the jury that such evidence "can only be considered by you as testing the opinions of witnesses

who testified to the value of the lands sought to be condemned.''

The court refused to allow the witness Campini to give his opinion as to the market value of the land. His knowledge of market values 'of lands was not such as to give much weight to any opinion he might have stated, but it would not have been error to permit him to give it. However, the defendant produced twelve other witnesses, who gave their opinions as to ·the market value of the lands taken, ranging from $10,348,982.50 to $15,000,000, and their estimates of severance damages ranging from $210,000 to $1,680,000. In *Vallejo etc. R. R. Co.* v. *Reed Orchard Co.,* 169 Cal. 545, 576 [147 Pac. 238, 252], in considering a similar ruling, the court said: ''It does not appear that qualified witnesses on the subject were at all difficult to obtain. Before this witness was called the defendants had already called seven witnesses who had testified on the subject of value. Hence, even if the ruling had been clearly erroneous, we cannot say that it was sufficiently prejudicial to warrant a reversal.''

One of defendant's witnesses was questioned in cross-examination regarding sales of land in the Exchequer reservoir basin, and in an effort to account for the low prices paid for such land, he testified that it was necessary to move a railroad from that basin at a cost of $5,000,000. In redirect examination he was asked why he included the $5,000,000, so expended in the cost of that reservoir. The court sustained the plaintiff's objection to the question. While the objection might well have been overruled, no prejudice was sustained by appellant by reason of the ruling made. The reason sought to be shown by the witness is perfectly obvious and one which every juror must have inferred from the facts already proved. It cannot be presumed that any juror was so lacking in intelligence as not to know that, other things being equal, a reservoir site which is free from obstructions is of greater value than one from which an obstruction must be removed at great expense.

Appellant contends that it was error to admit in evidence ''certain water filings of J. W. Preston et al.'' Most of the facts shown by these filings were brought out, without objection, on cross-examination of the defendant's witnesses long before the filings themselves were introduced.

Subsequently, and before the filings were introduced, the defendant, on redirect examination, gave a list of the Preston filings and the dates thereof. Under the circumstances stated the appellant cannot be. heard to complain of the introduction of the filings in evidence.

The defendant sought to show that, in a report made to the plaintiff by one of its engineers, it was stated that the district was without a reliable water supply ''and none that can be relied upon to meet the natural growth of future years. . . . Industries have, consequently, sought other locations. . . . The time has come when it is imperatively necessary for the East Bay District to undertake, as quickly as possible, the provision of a large and generous water supply of a high degree of purity, and to end, once and for all, the danger of water famine that has been hanging like a millstone around its neck for the past generation, impeding the growth of the cities and threatening their very existence.'' The court sustained plaintiff's objection to such parts of the report and other similar statements therein, as well as other evidence to the same effect. Appellant was permitted, however, to introduce parts of the report stating that ''the surplus supply has never been large, and the district has at times been on short rations. . . . The (Mokelumne) supply is the nearest of any of which the quality is satisfactory. . . . The designated source'' is ''the quickest, the cheapest, the purest, the safest, and the best supply available. We are of the opinion that a supply of 50 M. G. D. can be obtained from the Mokelumne river by the construction of the first unit of this project at a capital expenditure of about $39,000,000.'' It is urged that the evidence excluded tends ''to show the state and condition of the 'market' for the lands in question, from the viewpoint of their availability for reservoir use.''

Granting that the appellant had the right to show that the cities in the plaintiff district, as well as other cities and communities, furnished an available market for the water which could be impounded in the reservoir in question, that fact was abundantly shown by the parts of the report admitted in evidence. Indeed, the most skeptical would not require further proof thereof than the willingness of the plaintiff to expend $39,000,000 to secure a supply of water from that source. The appellant did not have the

right to show the plaintiff's necessity of obtaining a supply of water from that particular source or the special value to the plaintiff of such a supply. (*City of Stockton* v. *Vote, supra; City of Stockton* v. *Ellingwood, supra.*) ▮ Over the defendant's objection the court permitted counsel for the plaintiff to open and close the argument to the jury. It was a matter within the discretion of the trial court. (*Mendocino County* v. *Peters*, 2 Cal. App. 24, 29 [82 Pac. 1122]; *People* v. *Hickman*, 204 Cal. 470 [268 Pac. 909].)

▮ It is contended that the court abused its discretion in limiting defendant's time to argue the case to a period of three hours. Admittedly, "the duration of an argument is a matter which rests largely in the discretion of the trial court." In this case there was but a single issue to be determined by the jury. Counsel for both parties consumed a part of the time allotted to them in the argument of matters which the jury had no right to consider. The material evidence bearing on the issue of value was not difficult to understand and it cannot be held that the limitation was an abuse of discretion. Plaintiff's opening argument was completed at about the usual adjournment time in the evening, and the question arose as to the hour at which court should convene the next morning. Counsel who argued the case for the defendant said: "I would prefer nine, . . . because I want to get through before twelve. . . . It may not take that long." Appellant has not called attention to any objection in the record to the limit placed on the time for argument or to any request for further time. It does not appear that the defendant was prejudiced by such limitation.

The court gave the following instructions:

"I instruct you that the amount of the damage that should be awarded to the defendant Stephen E. Kieffer for the property sought to be condemned in these actions is the market value, which term 'market value' means the highest price, estimated in terms of money, which such property would have brought, . . . if exposed for sale in the open market, with a reasonable time within which to find a purchaser buying with a knowledge of all the uses and purposes for which said lands are adapted, and for which same were and are capable. . . . The question for you to consider is, if Stephen E. Kieffer had wanted to sell

these properties in the condition they were in on the dates heretofore mentioned, what could he have obtained for the said properties on the market, having been allowed a reasonable time in which to find a purchaser buying with a knowledge of all the uses and purposes to which such properties were adapted and for which said properties were capable, from parties who wanted to buy and who would give the fair value for such properties.

"You are not to consider what the land was worth to the defendant Stephen E. Kieffer, the owner, for speculation or merely possible uses, nor what he claims it was worth to him. . . .

"The term 'market value' and the term 'actual value' as used in these cases and in these instructions means one and the same thing. It means the highest price in terms of money at which the properties in question could have been sold. . . . It contemplates a seller who is not forced to sell, but who is willing to sell at a fair price. It contemplates a buyer who is willing to buy at a fair price and desires to buy the kind of property in question, but is not forced to buy. It contemplates a buyer who buys with an accurate knowledge of all the characteristics of the property. . . . It does not contemplate an execution sale, or a foreclosure sale, or any other forced sale."

Appellant objects to the terms "fair value" and "fair price" as used in the foregoing instructions. It is apparent that the word "fair" as here used means "honest" rather than "average" or "middling." The jury could not have been misled by the use of such terms after the accurate definition of the term "market value" which the court repeatedly gave. Objection is also made to the statement that in arriving at the value of the land the jurors are not to consider what the defendant "claims it was worth to him." Appellant contends that this was in effect a direction to disregard the defendant's testimony as to the value of the land. The contention is manifestly without merit. What the defendant claims the property is worth "to him" or what it is actually worth "to him" is immaterial, he being entitled only to its market value, regardless of what it is worth "to him."

The court instructed the jury that the defendant "is required to prove his side of the issue by a prepon-

derance of the evidence. By preponderance of the evidence is meant not the number of witnesses testifying for either party, but that evidence which produces conviction in the unprejudiced minds of the jurors." No other definition of the term "preponderance of the evidence" was requested by either party or given by the court. The ordinary meaning of the word "conviction," in the sense here used, is the state of being convinced, and to convince is to satisfy by proof. To produce conviction in the mind is to satisfy the mind, the terms being synonymous. Instructions containing one or both of these terms have been considered in many cases. (*De La Torre* v. *Johnson*, 203 Cal. 374 [264 Pac. 485]; *Boa* v. *San Francisco-Oakland T. Rys.*, 182 Cal. 93 [187 Pac. 2]; *Estate of Ross*, 179 Cal. 629 [178 Pac. 510]; *People* v. *Miller*, 171 Cal. 649 [154 Pac. 468]; *Ergo* v. *Merced Falls Gas & Elec. Co.*, 161 Cal. 334 [41 L. R. A. (N. S.) 79, 119 Pac. 101]; *Gregoriev* v. *Northwestern Pac. R. Co.*, 95 Cal. App. 428 [273 Pac. 76]; *Harker* v. *Southern California Edison Co.*, 83 Cal. App. 204 [256 Pac. 848]; *Los Angeles City H. S. Dist.* v. *Schumann*, 78 Cal. App. 353 [248 Pac. 737]; *Estate of Guilbert*, 46 Cal. App. 55 [188 Pac. 807]; *Lawrence* v. *Goodwill*, 44 Cal. App. 440 [186 Pac. 781].) In the Miller case the defendant was on trial for murder and his only defense was that he was insane at the time he killed the deceased. On the issue of insanity the court instructed the jury that "preponderance of the evidence means that degree of evidence which proves to a moral certainty, or, in other words, that degree of proof that produces conviction in an unprejudiced mind, regardless of the number of witnesses from whom it proceeds." The court, in that case, also gave the usual definition of "reasonable doubt." By reason of the similarity of language in the two instructions the jurors were probably misled into the belief that it devolved on the defendant to prove his alleged insanity beyond a reasonable doubt. In discussing a similar instruction in the Boa case it is said: "It may well happen in some cases that an instruction in the form here given would necessarily be considered prejudicially misleading. This is especially apt to be true of an instruction regarding the burden of proving the defense of insanity in a criminal case where other instructions concerning burden of proof are of course framed to impress upon the jury that guilt must

be proved to a moral certainty and beyond a reasonable doubt.'' The other instructions in this case are not misleading as to the proof required of the defendant. The outstanding feature of the instruction complained of, and the one which doubtless most impressed the jury, is that the testimony of the greater number of witnesses does not necessarily constitute a preponderance of the evidence. They probably understood it to mean merely that they were not bound to decide in conformity with the declarations of any number of witnesses against more convincing evidence. Academically, the instruction is inaccurate and it should not have been given, but it is highly improbable that the jurors were misled thereby. Appellant contends that many other instructions given by the court are erroneous, but a careful examination of them fails to substantiate the contention.

■■■ Appellant complains of the court's refusal to give an instruction relating to the provisions of article 16 of the plaintiff's federal license. The license was introduced in evidence over the defendant's objection. Prior to its formal introduction, however, article 16 had been read before the jury and much testimony as to the effect of its provisions had been given, all without objection. Articles 16 and 29 of the license read as follows:

''Article 16. The licensee shall construct said Lancha Plana dam, reservoir and spillways so that surplus waters in excess of amounts carried through its aqueduct to supply its municipal and domestic needs may be diverted northward from said reservoir to the Jackson creek watershed; and the licensee shall permit, without charge, any appropriator having specific authorization from the division of water rights, state of California, so to divert such surplus waters as may lawfully be diverted; provided, that the use of said dam and appurtenances by the licensee for the purpose of storing waters to be carried through its aqueduct shall be deemed to be the paramount use thereof and to be superior to their use for such diversion; that anyone so diverting shall save the licensee harmless from any damage resulting therefrom; and that the licensee will not be required hereunder to permit such diversion unless the primary purpose thereof be for a beneficial use other than the generation of power.''

"Article 29. With the written consent of the licensee, the commission may by order made under its seal, and after the public notice required by section 6 of the act, modify, alter, enlarge or omit, in so far as authorized by law, any one or more of the conditions or provisions of this license."

At the defendant's request the court instructed the jury:

"In determining the market value of the lands sought to be condemned . . . you may . . . consider the requirements of the license issued by the federal power commission to plaintiff, . . . but in considering the same you will do so in the same manner that you would have considered such license had it been granted to some other person."

No other instruction was given in relation to such license. The instruction relating to article 16, which the appellant contends it was error to refuse, reads as follows:

"The defendants are not parties to the license issued to the plaintiff by the federal power commission and you are instructed that this license may be altered or modified without the consent of the defendants and without consulting the defendants by mutual agreement between the federal power commission and plaintiff, and that, too, without the consent of the defendants. This right of the federal power commission and the plaintiff to modify and alter the provisions of said license applies to the provisions of the license introduced in this case concerning the discharge of any water into the Jackson creek watershed from the Mokelumne river."

Article 29 was read before the jury and its provisions were frequently referred to and discussed by the attorneys and the witnesses during the trial. While the instruction in question might well have been given, it seems clear that the jurors must have understood the provisions of article 29 without any instruction as to the meaning thereof.

The court refused to instruct that in testing the opinions of witnesses who had considered other sales in arriving at the market value of the land taken the jurors might "consider whether the purchaser or whether the seller in such other sales knew and appreciated the adaptability for useful purposes of the property sold or purchased." The proposed instruction is but the statement of a mere commonplace which any juror would consider without being told to do so.

The court refused to give a series of instructions requested by the defendant, containing in varying terms the propositions set forth in the first thereof, as follows:

"You are not to fix the market value of the lands sought to be condemned by the necessities of the plaintiff, but this does not mean that you cannot consider the plaintiff as a competitor for the reservoir site constituted by the use of the lands sought to be condemned and other lands. The demand for a site in which to store water for use generally may be considered by you, and among other such demands you may consider the demands of the East Bay Municipal Utility District as they existed at the date of and prior to the dates respectively of the issuance of the summons in the several cases."

At the defendant's request the court instructed the jury as follows:

"You are not to take into consideration the necessities of the plaintiff in fixing the market value of the property sought to be condemned; however, you may consider the plaintiff as a competitor for the land sought to be condemned at the time the respective summons were issued and prior thereto."

It is not readily perceived in what manner the jury could consider the plaintiff as a competitor for the land sought to be condemned without considering the demands of the plaintiff. The word "demand," as used in the instruction refused, means "a desire to purchase a commodity, accompanied by means of payment." The word "competitor," as used in the instruction given, may be defined as "one who desires and endeavors to buy the same property or in the same market as another and has the means of payment." It thus appears that the proposition of law stated in the instruction given is in substance the same as that contained in the one refused. To instruct the jury to consider the "demands" of the plaintiff, without any definition of that term, would have tended to confuse rather than to clarify.

The appellant urges that many other proposed instructions should have been given. They have been carefully considered and compared with those given, and no error has been discovered in the rulings of the court in relation thereto.

Appellant contends that the verdicts and the judgments are not supported by the evidence. In his brief it is said: "Defendant's witnesses testified to values ranging from $10,348,982.50 to $15,000,000. Plaintiff's witnesses testified to values ranging from $191,890 to $280,500." The jury fixed the value at the sum of $336,452.60, or in round num-

bers, $46 an acre. It is not perceived in what respect the evidence is insufficient to support the verdict and judgment. It is true that the evidence would have supported a larger verdict, but the amount to be awarded, within the reasonable range of the evidence, was a question for the sole determination of the jury and the trial court. It cannot be held as a matter of law that the market value of the land is greater than was found by the jury.

The reporter's transcript covers more than 5,000 typewritten pages. The briefs, exclusive of the supplements containing the evidence relied on, contain over 900 pages. As is usual in a record of such length, some technical errors are to be found therein, but none of them appears to be prejudicial. To specifically discuss all the points raised by the appellant would extend this opinion to an unreasonable length. They have all been carefully examined and it is not deemed that any of them not discussed herein have any merit. Neither is it believed that the errors pointed out in this opinion warrant a reversal.

The judgments are affirmed, appellant to recover costs of appeal.

Thompson (R. L.), J., and Plummer, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on June 26, 1929, and the following opinion then rendered thereon:

THE COURT.—The appellant has filed a petition for a rehearing.

It is again urged that physical contiguity of different parcels of land is not necessary to entitle the owner in a condemnation proceeding to severance damages and that the statement to the contrary in *Oakland* v. *Pacific Coast Lumber & Mill Co.*, 171 Cal. 392, 399 [153 Pac. 705], is *dictum*. The appellant in that case had insisted in the trial court ''that the physical separation was negligible because unity of use and not physical contiguity was the controlling factor.'' The trial court held adversely to this contention. In affirming the judgment the supreme court held that unity of use was not the controlling factor and, after quoting from section 1248 of the Code of Civil Procedure, relative to severance damages, said: ''This very language limits in

terms the award of damages to the property taken and the resultant damages to contiguous property injured by severance of the property taken." This language is not. *dictum*. ██ "Where there are two grounds, upon either of which the judgment of the trial court can be rested, and the appellate court sustains both, the ruling on neither is *obiter*; but each is the judgment of the court, and of equal validity with the other." (*Union Pac. R. Co.* v. *Mason City & Ft. D. R. Co.*, 199 U. S. 160 [50 L. Ed. 134, 26 Sup. Ct. Rep. 19; see, also, Rose's U. S. Notes] ; *Williams* v. *Southern Pac. Co.*, 54 Cal. App. 571, 579 [202 Pac. 356].)

It is further argued that the trial court unduly restricted the cross-examination of the plaintiff's witnesses. ██ It is true that wide latitude should be allowed in the cross-examination of witnesses, but it is equally true that a trial court has "discretionary power over cross-examination which will be disturbed on appeal only in case of an abuse thereof." (27 Cal. Jur. 97.) The field of inquiry in cross-examination for the purpose of testing the credibility of a witness and the weight of his testimony is so extensive that the trial court must be given a wide discretion in order to keep such examination within reasonable bounds; otherwise the trial of cases would be overlong. ██ When an appellate court is called upon to decide whether such discretion has been abused, the inquiry is whether a sufficiently wide range has been allowed to test such credibility and weight rather than whether some particular question should have been allowed. (*People* v. *McDonald,* 167 Cal. 545, 547 [140 Pac. 256].) The 5,000 pages of the reporter's transcript abundantly bear witness to the extreme liberality of the trial court in permitting a wide cross-examination of the witnesses in this case. ██ When a question is asked for the ostensible purpose of testing the credibility of a witness or the weight of his testimony, the trial court has a reasonable discretion to determine whether that is in fact the purpose of the question or whether its real purpose is "to get the substance of the inquiry before the jury as an evidentiary fact." (*People* v. *Weber,* 149 Cal. 325, 343 [86 Pac. 671, 678] ; *People* v. *Ferdinand,* 194 Cal. 555, 562 [229 Pac. 341].) In this case the trial court was justified in the belief that the defendant's real purpose in attempting, by the cross-examination of the plaintiff's witnesses, to show

the present selling price of water and electric power was to get those facts before the jury as evidence upon which to base calculations as to the prospective returns to be received by the plaintiff after the completion of the project. That such belief was not without foundation as shown by the argument of counsel for defendant before the jury, during which there was exhibited computations such as the following: "Available supply for domestic use, 200,000,000 gallons daily. Sale of water for domestic use at 10¢ per 1000 gallons, 200,000 times 10¢, $20,000 per day. 365x20,000, $7,300,000 per year." The rulings of the trial court in excluding proof of the prices mentioned and similar evidence upon which to base speculative profits do not constitute an abuse of discretion under the authorities cited in the opinion.

Appellant contends that the cases cited in the opinion in support of the doctrine of relation of title "relate to rights respecting the land being condemned, intervening between the filing of suit, or *lis pendens,* and the payment of the award." There is nothing in the opinion of contrary import and, since the titles finally acquired by the plaintiff to the lands in the first two suits relate back to the commencement thereof, the defendant's contention that he had established physical union between the lands in the third suit and the Arroyo Seco lands through the medium of those in the first two suits was certainly the assertion of "rights respecting the land being condemned" in those suits. If the owner of the lands in the third suit had retained the ownership thereof and had purchased all of the defendant's lands, with knowledge of the pendency of the first two suits, it would hardly be contended, the other circumstances being the same as stated, that he would be entitled to damages by reason of the severance of the lands in the third suit from the Arroyo Seco lands. It does not appear that the defendant's rights are in any respect different.

Appellant says, in substance, that the plaintiff could have abandoned the first two proceedings at any time within thirty days after final judgment and at the same time could have taken the lands in the third proceeding and that, in such event, under the doctrine of relation as stated in the opinion, the defendant would have been deprived of severance damages to which he would have been entitled. Since the land was being condemned for reservoir purposes, it was absolutely necessary for the plaintiff to acquire at

least the greater part of the lands in each suit. To have abandoned any one of the proceedings, therefore, would have been to abandon the project, for it seems clear that the plaintiff in a condemnation suit cannot, in effect, grant himself a new trial by the simple expedient of abandoning the proceeding after final judgment and then commencing another proceeding to condemn the same property. (*Central of Georgia Ry. Co.* v. *Thomas,* 167 Ga. 110 [144 S. E. 739]; *Chicago, R. I. & P. R. Co.* v. *City of Chicago,* 143 Ill. 641 [32 N. E. 178]; *Robertson* v. *Hartenbower,* 120 Iowa, 410, [94 N. W. 857]; *Northern Pac. Ry. Co.* v. *City of Georgetown,* 50 Wash. 580 [97 Pac. 659].)

██ The three proceedings, at the time of the trial, were in the same court, between the same parties, and were being prosecuted for the condemnation of three adjoining parcels of land belonging to the defendant. The court made an order consolidating them. By such consolidation the three proceedings became one proceeding and should have been determined by a single verdict, "a single set of findings and a single judgment." (*Stanton* v. *Superior Court,* 202 Cal. 478, 484 [261 Pac. 1001, 1003].) There are in fact three verdicts, three sets of findings and three judgments, but under the authority of the Stanton case they are to be treated as one verdict, one set of findings and one judgment. ██ It logically follows that the plaintiff was without power to abandon any one of the original proceedings after final judgment without abandoning all of them and that, therefore, the defendant stood in no danger of being injured by a partial abandonment.

By the statement in the opinion that "the evidence would have supported a larger verdict" it was by no means intended to imply that the defendant was entitled to a larger award. It is equally true that there is evidence which would justify a smaller award. There is nothing in the record to warrant a holding on appeal that the award is not fair and just.

The petition is denied.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on July 25, 1929.

All the Justices present concurred.